UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN McCLINTOCK,<br><br>    Plaintiff,<br><br>    v.<br><br>T. COOPER, et al.,<br><br>    Defendants. | No. 2: 18-cv-0560 JAM KJN P<br><br>ORDER AND FINDINGS AND RECOMMENDATIONS |

Plaintiff is a state prisoner, proceeding without counsel, with a civil rights action pursuant to 42 U.S.C. § 1983. Pending before the court is plaintiff's motion for sanctions (ECF No. 101) and defendants' cross-motion for terminating sanctions (ECF No. 109.)

For the reasons stated herein, plaintiff's motion for sanctions is denied. The undersigned recommends that defendants' motion for terminating sanctions be denied without prejudice.

Legal Standard

Both parties seek sanctions under the court's inherent authority.

"Federal courts possess certain 'inherent powers,' not conferred by rule or statute, 'to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" Goodyear Tire & Rubber Co. v. Haeger, 137 S. Ct. 1178, 1186 (2017) (quoting Link v. Wabash R. Co., 370 U.S. 626, 630–31 (1962)). "That authority includes 'the ability to fashion an appropriate sanction for conduct which abuses the judicial process.'" Id. (quoting Chambers v.

NASCO, 501 U.S. 32, 44–45 (1991).  This power includes the ability to punish conduct before the court as well as actions beyond the court's confines, regardless of whether that conduct interfered with courtroom proceedings.  See Chambers, 501 U.S. at 44.

A district court may, among other things, dismiss a case in its entirety, bar witnesses, exclude other evidence, award attorneys' fees, or assess fines.  F.J. Hanshaw Enterprises, Inc. v. Emerald River Development, Inc., 244 F.3d 1128, 1136 (9th Cir. 2001).  Although it is preferable that courts use—and first consider—the range of federal rules and statutes dealing with misconduct and abuse of the judicial system, "courts may rely upon their inherent powers to sanction bad-faith conduct even where such statutes and rules are in place." Id. at 1136–37; see also Chambers, 501 U.S. at 50 ("[W]hen there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than the inherent power. But if in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power.").

In Am. Unites for Kids v. Rousseau, 985 F.3d 1075, 1088-90 (9th Cir. 2021), the Ninth Circuit recently "provided a primer concerning the framework for imposing inherent-authority-based sanctions." MacNeil Automotive Products Limited v. Jinrong (SH) Automotive Accessory Development Co., 2021 WL 3674792, at *8 (W.D. Wash. Aug. 19, 2021). "In doing so, the Ninth Circuit cautioned that, '[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion.'" Id. (quoting Rousseau, 985 F.3d at 1088.)  Individuals subject to sanctions are afforded procedural protections, which vary depending on the violation and the type and magnitude of the sanction.  985 F.3d. at 1088-89.  When only civil-type procedures are used, the sanctions "may go no further than to redress the wronged party 'for losses sustained' and may not impose any additional consequence as punishment for the sanctioned party's misbehavior." 985 F.3d at 1089.  To penalize or punish litigation misconduct, the court must offer criminal-type guarantees, including application of a "beyond a reasonable doubt" standard of proof, a jury trial, the assistance of counsel, a presumption of innocence, and the privilege against self-incrimination.  985 F.3d at 1089 (citing inter alia Goodyear Tire & Rubber Co. v. Haeger, 137 S. Ct. at 1178.

The Ninth Circuit in Rousseau did not clearly address the standard of proof required for imposition of compensatory or remedial sanctions. The Ninth Circuit has not previously decided the burden of proof required for an award of compensatory or remedial sanctions, but has held that clear and convincing evidence of bad faith will suffice. Lahiri v. Universal Music & Video Distribution Corp., 606 F.3d 1216, 1219 (9th Cir. 2010); In re Lehtinen, 564 F.3d 1052, 1061 n.4 (9th Cir. 2009), abrogated on other grounds by Gugliuzza v. Fed. Trade Comm'n, 852 F.3d 884 (9th Cir. 2017).

Plaintiff's Motion for Sanctions (ECF No. 101)

Plaintiff alleges that he was thrown in administrative segregation ("ad seg") after falsely being accused of writing a note threatening to harm defendants. Plaintiff alleges that his legal property was confiscated after he was thrown in ad seg.

Plaintiff alleges that he later signed the inventory form for ten boxes of legal property but received only nine boxes. Plaintiff alleges that he is now missing a "key box" of legal property that contained evidence regarding the instant action.

Plaintiff alleges that defendants plotted to have plaintiff thrown in ad seg based on false accusations. Plaintiff also alleges that defendants are responsible for his missing legal property and refuse to return it. Plaintiff requests that his missing legal property be returned and that sanctions be imposed, including either monetary sanctions, the appointment of counsel or an order granting plaintiff's request for production of documents (attached to the motion for sanctions).

Defendants' Opposition and Cross-Motion for Sanctions (ECF No. 109)

Defendants argue that plaintiff has presented no evidence that defendants were responsible for placing him in ad seg or for confiscating one of his boxes of legal property. Defendants argue that the evidence shows that plaintiff was charged and disciplined by non-party prison officials for submitting an anonymous note threatening to kill several of the defendants and their family members. Defendants argue that the evidence shows that non-party officials inventoried and stored eight boxes of plaintiff's legal property during his ad seg placement and recent records show that plaintiff was transferred with eight boxes of legal property.

The undersigned herein discusses defendants' evidence submitted in support of the opposition and cross-motion for sanctions.

Plaintiff was placed in ad seg on June 10, 2020, after being issued a rules violation report by non-defendant Sergeant Valencia for threatening to kill a public official. (ECF No. 109-1 at 2, 5, 26.) The rules violation report states that on June 10, 2020, Sergeant Valencia received an anonymous letter stating that plaintiff was planning to kill or assault defendants Cooper and Cantu and their family members. (Id. at 5.) The anonymous note states,

> I/M John McClintock is planning to kill/assault bring harm to the family of Lt. T. Cooper and CO Cantu & Lt. T. Cooper and CO Cantu.
>
> McClintock has access to their personnel file and Lt. Cooper and CO Cantu's home address due to a lawsuit case # 2: 18-cv-560 JAM US District Court Eastern Dist. Of CA where McClintock is suing Canto/Cooper.
>
> McClintock has hired some ex-mafia (MA) prison gang types.
>
> This is serious shit.  Act on it now.

(Id. at 43.)

On June 10, 2020, Sergeant Valencia also received from plaintiff an Inmate/Parolee Request for Interview Form requesting assurance from Captain Luther that staff would not retaliate against plaintiff for his lawsuit against defendants Cooper and Cantu. (Id. at 5.) In the rules violation report, Sergeant Valencia wrote that a handwriting analysis was conducted, "which clearly indicated the handwriting on both documents were written by the same person." (Id.)

On August 3, 2020, non-defendant Correctional Counselor ("CC") McCarthy and Sergeant Valencia interviewed plaintiff regarding the charges. (Id. at 27-28.) In the report from the interview, CC McCarthy wrote,

> I initiated the interview by asking McClintock what he knew about the threats. McClintock immediately replied, "I didn't write that note." I had in front of me two pieces of paper, one a GA-22 form submitted by inmate McClintock and the other the threatening handwritten note. I asked inmate McClintock, "What note?" McClintock pointed to the note as he said, "That threatening note." I then asked inmate McClintock if he authored and submitted the form GA-22. McClintock verbally affirmed he did. I then analyzed the handwriting on both pieces of paper. It immediately became

4

> obvious to me that the same person authored both notes based on unique letter characteristics and writing styles. At that point inmate McClintock was no longer an information source but was then considered a suspect of being the actual author of the threatening note. I then informed McClintock of his status as a suspect and read him his Miranda admonishment from a departmentally issued Miranda warning card. Sergeant Valencia was present at the admonishment. Inmate McClintock acknowledged understanding his rights by answering "Yes" when I asked him if he understood. I then asked McClintock if he still wanted to continue with the interview, he replied, "Yes." I asked McClintock why he wrote the threatening note. Inmate McClintock replied, "I didn't write that note. That's not even my lingo." It should be noted at no time was inmate McClintock provided an opportunity to view or read the threatening note. I asked Inmate McClintock, "What lingo?" Inmate McClintock replied with an accurate description of the threats and stated, "I don't have anything against those people and I don't talk like that." I asked inmate McClintock, "You don't talk like what?" Inmate McClintock replied, "Threatening staff." At that point I concluded inmate McClintock presented an immediate threat to cause serious injury or death to Lieutenant T. Cooper and Officer L. Cantu and I initiated inmate McClintock's placement into the Administrative Segregation Unit pending a Threat Assessment Response Team evaluation and adjudication of a serious rules violation report.

(Id. at 27-28.)

On August 19, 2020, Lieutenant Best found plaintiff guilty of the rules violation report. (Id. at 17.) Copies of plaintiff's Inmate/Parolee Request Form and the threatening letter are attached to defendants' opposition. (Id. at 42, 43.)

While plaintiff was in ad seg, his personal and legal property were stored at the Receiving and Release property office at the Mule Creek Infill Complex. (Id. at 2.) Defendants provide a Property Inventory Form for plaintiff dated June 10, 2020. (Id. at 47.) The form states that plaintiff's property was inventoried based on plaintiff's ad seg placement. (Id.) The form states that plaintiff had eight boxes of legal property. (Id.) This form appears to contain plaintiff's signature, dated June 10, 2020. (Id.)

When plaintiff was released form ad seg, he refused to sign the Inventory Form because his legal property was still stored at the Mule Creek Infill complex. (Id.)

On August 6, 2021, plaintiff was transferred to the California Health Care Facility in Stockton. (Id. at 2.) Defendants provided a Property Inventory Form for plaintiff dated August 6,

2021.  (Id. at 49.)  The form states that plaintiff's property was inventoried based on plaintiff's transfer to the California Health Care Facility ("CHCF").  (Id.)  This form states that plaintiff had ten boxes of property, including eight boxes of legal property.  (Id.)  This form appears to contain plaintiff's signature, dated August 6, 2021.  (Id.)

Defendants have also provided the declaration of Mule Creek State Prison ("MCSP") Litigation Coordinator D. Santos who states that at the request of the California Attorney General's Office, he searched for and reviewed the work assignment records for defendants J. Cantu, T. Cooper, M. Armenta, B. Walker, L. Cantu, A. Wheeler, C. Winkler and M. Allen to determine if any of the defendants were assigned to positions that would have given them access to plaintiff's legal property boxes while they were stored at Mule Creek Infill Complex.  (Id. at 2.)

CC Santos states that his search revealed that from June 10, 2020, to August 20, 2020, defendant Armenta was assigned as a yard officer at Facility B; defendant J. Cantu was assigned as a floor officer and patrol officer at Facility E; defendant L. Cantu was assigned as a security patrol officer at Facility D; defendant T. Cooper was assigned as a program lieutenant at Facility D; defendant Walker was assigned as a health are transport officer; and defendant Winkler as assigned as a floor officer at Facility B, a transport officer and a security patrol officer at Facility A.  (Id.)  The search also revealed that defendant Wheeler was employed at the California Medical Facility ("CMF") in Vacaville, not at MCSP, during this time period.  (Id.)

CC Santos states that based on his search and review of the defendants' work assignment records, he does not believe any of the defendants were assigned to positions that would have given them access to plaintiff's legal property while it was stored at Mule Creek Infill Complex.  (Id. at 3.)  CC Santos also states that on August 6, 2021, plaintiff was transferred to the CHCF in Stockton.  (Id. at 2.)

Plaintiff's Reply/Opposition (ECF No. 115)

The undersigned does not herein discuss all matters discussed in plaintiff's reply/opposition.  However, the undersigned sets forth the allegations in this pleading regarding plaintiff's alleged missing property.

6

Plaintiff states that on June 10, 2020, ten boxes of his property, including eight boxes of legal property, were delivered to the program office. (ECF No. 115 at 9.) Plaintiff states that in September 2020, nine boxes of his property were returned to him. (Id.) Plaintiff alleges that the missing box contained legal property. (Id.) Plaintiff states that the Receiving and Release Sergeant documented the missing box and told plaintiff he would have to file a grievance. (Id.) Plaintiff states that the "missing box contents" has been "well documented" and that the Receiving and Release Sergeant was informed in writing of the missing box. (Id.) Plaintiff does not provide a copy of any documents, such as grievances, discussing the alleged missing box of legal property.

Discussion—Plaintiff's Motion for Sanctions

Plaintiff moves for sanctions on the grounds that defendants plotted to have plaintiff thrown in ad seg based on the false accusation that plaintiff wrote the note threatening defendants. Plaintiff alleges that one box of his legal property, placed in storage while he was in ad seg, is now missing. Plaintiff alleges that defendants refuse to return his missing legal property.

In the instant action, plaintiff appears to seek compensatory and, possibly, punitive sanctions. However, under either standard of proof (beyond a reasonable doubt or clear and convincing evidence), plaintiff has not met his burden of demonstrating that defendants participated in a plot to have plaintiff falsely charged with writing a threatening note against them. Plaintiff has also not met his burden under either standard of demonstrating defendants involvement in the alleged loss of the box of his legal property. Plaintiff's claims regarding defendants' involvement in these activities are speculative.

The undersigned also observes that while plaintiff claims that his box of legal documents was not returned in September 2020, plaintiff fails to address the August 6, 2021 Property Inventory Form, containing his signature, stating that plaintiff had eight boxes of legal property, i.e., all of his legal property.

Accordingly, for the reasons discussed above, plaintiff's motions for sanctions is denied.[1]

---

[1] In his reply/opposition, plaintiff states that he brought defendants' alleged misconduct to the attention of the court in another action, 2:21-cv-850. After reviewing the docket in case 21-cv-

7

Defendants' Motion for Terminating Sanctions

Defendants move the court for an order under its inherent authority imposing terminating sanctions against plaintiff. Defendants contend that threatening to harm or kill an opposing party is a type of "willful improper conduct" that constitutes bad faith. See Davis v. Saint Luke's Roosevelt Hospital, 2018 WL 10384114, at *1 (S.D. N.Y. Apr. 16, 2018) (quoting Kalwasinski v. Ryan, 2007 WL 2743434, at *2 (W.D. N.Y. Sept. 17, 2007) (""Death threats directed at an opposing party and a witness are sufficiently serious to warrant the sanction of dismissal.'").)

In the pending motion, defendants argue that plaintiff willfully directed threats toward defendants Cooper, Cantu and their respective family members. Defendants contend that while plaintiff denied writing the note, Sergeant Valencia and Counselor McCarthy reviewed the note and reported that the handwriting from the note matched plaintiff's handwriting from another CDCR form submitted the same day. Defendants also contend that Sergeant Valencia and Counselor McCarthy also reported that during the interview, plaintiff accurately described the contents of the threatening note without having the opportunity to view or read it.

At the outset, the undersigned finds that a terminating sanction is a punitive sanction, requiring proof beyond a reasonable doubt. See Davis v. Saint Luke's Roosevelt Hospital, 2018 WL 10384114, at *1 (citing Kalwakinski, 2007 WL 2743434, at (2 ("Dismissal is particularly appropriate where the plaintiff's conduct is so egregious that the Court seeks 'not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent.") However, for the reasons discussed herein, the undersigned finds that under either a reasonable doubt standard or a clear and convincing evidence standard, defendants did not demonstrate that plaintiff wrote the threatening note.

While Sergeant Valencia and Counselor McCarthy concluded that the handwriting on the threatening note and the CDCR 22 form matched, there is no evidence that Sergeant McCarthy and Counselor McCarthy are handwriting experts. The undersigned has reviewed the handwriting

---

850, it appears that plaintiff is pursuing the claims raised in the pending motion for sanctions in 21-cv-850.

from the threatening note and the CDCR 22 Form submitted by plaintiff on June 9, 2020. (ECF No. 109-1 at 42, 43.) While there are some similarities in the handwriting in these documents, the undersigned cannot conclude that the same person wrote both documents by simply looking at these documents.[2]

Defendants also argue that plaintiff's ability to describe the contents of the note during the interview with Counselor McCarthy and Sergeant Valencia without having read it demonstrates that plaintiff wrote the note. However, the documents submitted by defendants containing these statements by Counselor McCarthy and Sergeant Valencia are not verified.

In a verified declaration attached to his reply/opposition, plaintiff alleges that he was able to view the note during the interview:

> 7. Sgt. Valencia had a … interview. The Sgt. did the talking. His coarse language accused me for being "fucking stupid"  He proceeded to tell me (his words) "How [I] could be so fucking stupid to threaten staff." I immediately defended my 22-form that I addressed to Capt. Luther (confirmed/read and signed by C/O Kearns the night before just before 8:00 p.m. 'lock up'). I told the Sgt. that my "22 could never be construed as a threat. It was courteous and non-confrontational…" He interrupted me, "I'm not talking about the 22—we'll get to that later—I'm talking about this—" The Sgt. pulled out an anonymous note. I was close enough to see Fed. Case no. and the names T. Cooper and Cantu—I immediately told him that I didn't write that. That's not even close to my handwriting.

(ECF No. 115 at 12.)

Under either standard of proof discussed above (beyond a reasonable doubt or clear and convincing evidence), defendants have not demonstrated that plaintiff wrote the threatening note. Accordingly, the undersigned recommends that the motion for terminating sanctions be denied without prejudice.[3] Defendants may file a renewed motion for terminating sanctions supported

---

[2] The handwriting on the CDCR 22 Form submitted by plaintiff on June 9, 2020 is similar to the handwriting in plaintiff's pleadings filed in the instant action.

[3] Because defendants did not meet their burden of proof in demonstrating that plaintiff wrote the threatening note, the undersigned need not address the procedural protections due plaintiff based on a motion for terminating sanctions. If defendants renew their motion for terminating sanctions, they shall address the relevant legal standards.

by admissible and credible evidence demonstrating that plaintiff wrote the threatening note.[4]

Although the undersigned recommends that defendants' motion for terminating sanctions be denied without prejudice, the undersigned acknowledges the seriousness of the grounds raised by defendants.

Accordingly, IT IS HEREBY ORDERED that plaintiff's motion for sanctions (ECF No. 101) is denied; and

IT IS HEREBY RECOMMENDED that defendants' motion for terminating sanctions (ECF No. 109) be denied without prejudice.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be filed and served within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  October 12, 2021

_____
KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

Mcclin560.san

---

[4] Admissible and credible evidence that plaintiff wrote the threatening note would be an analysis by a certified handwriting expert and verified declarations by relevant prison officials.